U.S. EQUAL EMPLOYMENT                          CIVIL ACTION
OPPORTUNITY COMMISSION

VERSUS                                         NO. 08-4464

SFAILA, LLC                                    SECTION "F"


ORDER AND REASONS

Before the Court are three motions: (1) the EEOC's motion for partial summary judgment and (2) the defendant's motion for summary judgment.  For the reasons that follow, the motions are DENIED.

Background

This lawsuit arises out of a makeup artist's termination from employment following her return, with a broken wrist, from leave she took that was associated with medical issues related to her ulcerative colitis.

In November 2000 Marlene Babin was hired by Saks Fifth Avenue, where she worked initially as a salesperson and then she moved to the position of makeup artist at the Estee Lauder counter in 2001.[1] As a makeup artist, Marlene Babin was responsible for applying customers' makeup,[2] maintaining an adequate stock of makeup in her case, cleaning brushes and applicators, completing her goals by

_____

[1] Since 2001, Estee Lauder reimbursed Saks for one-half of Ms. Babin's hourly rate for the hours that she worked; however, Ms. Babin was an employee of Saks.

[2] Applying makeup was Ms. Babin's primary function; she typically performed an average of eight to nine makeovers each day.

promoting Estee Lauder products, and making sales.

Once she became a makeup artist working with Estee Lauder cosmetics, Ms. Babin reported to two co-supervisors, Christine Cooney and Marie Joyce (both of whom were cosmetics department managers).[3]  Cooney and Joyce reported to Kathryn Scurlock (assistant general manager of merchandise), who, in turn, reported to the general manager of the New Orleans store, Carolyn Elder. While each Saks store is typically assigned a human resource director, in 2004 the New Orleans store's human resource director left the company.  Until a replacement was hired in late February 2005, Larry Dauterive (assistant general manager of operations) handled those duties as well as his own.  Gina Gagliano, a human resources assistant, worked with Dauterive in the human resources department.  Margaret Phelan, who worked at Saks' New York offices, was the regional human resource director for the New Orleans region.

*Ulcerative Colitis Diagnosis*[4]

About a year before she began working at Saks, in October

---

[3] Ms. Babin asserts that she understood Ms. Joyce to be her direct supervisor.

[4] The Court notes that Ms. Babin's declaration submitted in support of the EEOC's motion for partial summary judgment goes into considerably more detail than her deposition testimony.  As noted later, the Court may not weigh the evidence or make credibility determinations; accordingly, the Court considers as part of the record the statements made in her declaration to the extent that they are not inconsistent with her deposition testimony.

1999, Ms. Babin was diagnosed with ulcerative colitis.[5] She was then 46 years old. She has not produced formed stool since 1999 and has consistently experienced severe abdominal pain shortly after eating, and continually has suffered painful diarrhea as many as 10 15 to 30 times daily. Unable to control her bowels, she has soiled herself on many occasions, and has often had to wear adult diapers. She must plan her activities around when she can eat to ensure that she will be near a bathroom. If she were to eat, as an average person does, three times a day with snacks, Ms. Babin says she would have diarrhea 60 times per day, and experience severe, constant abdominal pain.

From 1999 until February 2004, Ms. Babin experienced chronic

---

[5] Ulcerative colitis is described by the Mayo Clinic as:

> Ulcerative colitis...causes chronic inflammation of the digestive tract, [and] is characterized by abdominal pain and diarrhea. [It] can be debilitating and sometimes can lead to life-threatening complications. [It] usually affects only the innermost lining of your large intestine (colon) and rectum. It occurs only through continuous stretches of your colon.... There's no known cure..., but therapies are available that may dramatically reduce the signs and symptoms of ulcerative colitis and even bring about a long-term remission.

Http://www.mayoclinic.com/health/ulcerative%20colitis/DS00598. While both medications and surgery have been used to treat ulcerative colitis, surgery is reserved for those with severe inflammation and life-threatening complication.
Http://www.medicinenet.com/ulcerative_colitis/page4.htm

severe abdominal pain on a daily basis and her food intake was severely restricted. She would routinely eat only once a day, after work, in order to prevent the problems, pain, and frequency and embarrassment associated with her condition. After eating, she would often have to use the bathroom 10 to 18 times. She experienced severe bleeding in the course of eliminating waste; she routinely had to soak in a hot tub of water numerous times per night to relieve the pain in her rectal area that resulted from the frequent diarrhea and bleeding.

*Medical Leaves of Absence*

In February 2004 Ms. Babin's ulcerative colitis reached an acute stage: she was admitted to the hospital on February 18, 2004, beginning an extended period of medical leave. She was hospitalized for two months. She underwent surgery on March 4, 2004. In the first surgery, her large intestines were removed and a colostomy bag was temporarily implanted. Her rectum was eventually removed and replaced with tissue from her small intestine.

Since February 2004, as a result of her treatment, Ms. Babin has been unable to have sexual intercourse. She anticipates that she will never be able to have sexual intercourse again, due to the effects of the surgeries: she has had four surgeries in the rectal area and, as a result, that region of her body, including her

vaginal area, experiences extreme pain from physical contact.[6]

The first period of medical leave from Saks due to treatment of (and recovery from the surgery associated with) colitis lasted from February 18, 2004 through June 22, 2004.[7] During most of this four month period, Ms. Babin was covered by an employer-provided short-term disability policy, toward which she paid premiums in the form of wage withholdings. Her leave of absence was approved under the short-term disability policy; she received income insurance in the amount of half-pay.

Even after returning to work in June 2004, Ms. Babin continued to experience complications from her condition and the surgery intended to correct it. During the 10 months following February 2004 (roughly, February to December), Ms. Babin underwent a total of five surgeries and was given 11 pints of blood. Saks approved three additional medical leaves of absence under the short-term disability policy: from August 16, 2004 to September 2, 2004

---

[6] Ms. Babin has unsuccessfully attempted to have sex with her fiancé. She has sought assistance from her Colon and Rectal Surgeon, Dr. Beck, who prescribed a cream which he thought might make intercourse possible. It did not; it is excruciatingly painful for Ms. Babin to be touched in her vaginal area and, thus, intercourse is impossible.

[7] On February 18, 2004, Ms. Babin's condition required emergency admittance to the hospital; this resulted in a two-month long hospitalization, during which time Ms. Babin had two major surgeries.

(third surgery, implant of second colostomy bag)[8]; from November 4, 2004 to November 21, 2004 (fourth surgery connection of J pouch to rectum)[9]; and from December 24, 2004 to February 9, 2005 (fifth surgery, small bowel obstruction).[10] During these periods of leave, Ms. Babin was unable to perform any work, but she would return to work after she recovered from the surgeries.[11]

From February 2004 through February 2005, Ms. Babin was in the hospital for a total of approximately three months. During those hospitalizations (and for some period following hospitalizations), Ms. Babin was unable to care for herself.[12] Saks kept Ms. Babin's position open for the entire period she was on leave.[13]

---

[8] Saks contends that this second term of leave lasted one week from August 23, 2004 to August 30, 2004.

[9] Saks contends that the third term of leave lasted from November 2, 2004 to November 21, 2004.

[10] Saks contends that the last leave period began on December 27, 2004 and was approved through January 21, 2005.

[11] The EEOC does not dispute that Ms. Babin worked following and in between periods of medical leave but asserts, based on Ms. Babin's declaration, that during this time Ms. Babin wore adult diapers to work every day, had to use the bathroom frequently and urgently, and did not eat during work hours.

[12] For example, Ms. Babin was bed-ridden from February 17, 2004 until her return to work around June 22, 2004. When she was not in the hospital during this period, her sister took care of her.

[13] Saks asserts that no one performed Ms. Babin's duties in connection with Estee Lauder products while she was on leave unless Estee Lauder arranged and paid for a free-lance makeup artist. The EEOC disputes this, noting that the Estee Lauder counter had two other employees who performed makeovers and Ms.

During Ms. Babin's employment with Saks, its eligible employees were entitled to 26 weeks of short term disability leave in any 12-month period. An employee is eligible if she is "unable to work due to a personal illness or injury of short duration." (Under the policy, eligibility is not determined based on the employee's incapacity to perform the functions of the employee's own specific position.) According to Saks' statements to the EEOC during its investigation of Ms. Babin's charge of discrimination, Ms. Babin "had been out on leave total of 26 weeks" from February 2004 to February 2005.[14] During the short-term disability leaves of absence approved by Saks from February 2004 to February 2005,[15] Ms. Babin was paid a 50% benefit rate, based on a benefit rate of $19.00 an hour, as an income replacement benefit.

---

Joyce testified that Estee Lauder never incurred any additional expenses in connection with free lance workers when Ms. Babin was absent. Saks also suggests that, while Ms. Babin was on leave, unnamed Estee Lauder representatives assigned to Saks expressed their concerns to local Saks management about the fact that its products were not being adequately promoted while Ms. Babin was on leave. The EEOC disputes this fact, pointing to Ms. Joyce's testimony that no one at Estee Lauder expressed any concerns about Ms. Babin.

[14] The EEOC and Ms. Babin dispute the accuracy of the records Saks relied upon to show that she had been out 26 weeks. The EEOC suggests that the length of the leave and the amount of short term disability leave paid to Ms. Babin are not equal. For example, the EEOC contends that Ms. Babin's absence from work during leave periods does not necessarily mean that she was receiving short term disability leave each time or for the duration of her leave.

[15] According to the EEOC, not all of the leave time Ms. Babin used was approved short term disability leave time.

Saks approved Ms. Babin for a leave of absence under the short-term disability policy on at least three occasions.[16]  Under the short-term disability policy, to be eligible for benefits, an employee must be unable to work due to an injury or illness.[17]  On January 1, 2005, Ms. Babin became entitled to a new 26 weeks of short-term disability leave for the year, subject to meeting the eligibility requirements.[18]  According to Saks' records, Ms. Babin's final leave period was initially approved through January 21, 2005.  At some point in January, local management (Scurlock and Dauterive) contacted Margaret Phelan, the regional human resources director, to determine how to handle Ms. Babin's ongoing leave.[19]  According to Saks, Dauterive had determined that, as of the week ending January 29, 2005, Ms. Babin had taken twenty-five weeks of leave

---

[16] Saks admits this, but denies that it made the approval decision; according to its response to request for production, "this decision was made by Concentra."

[17] Ms. Babin paid premiums which she understood went toward her eligibility for short-term disability benefits.

[18] This issue is disputed.  According to Saks, company policy provides that "[a]ssociates on leave that extends into the next calendar year must return to active status for a minimum of 30 days before they receive the current year's sick and vacation grants."  Saks says this policy precluded Ms. Babin from accessing any of the 2005 sick or vacation leave in her leave bank as of January 1, 2005.  The EEOC disputes that Saks applies the policy or that the policy means what Saks says it means.

[19] The EEOC disputes this assertion; Ms. Phelan does not recall who contacted whom.

dating back to February 18, 2004.[20]  On January 27, 2005, Saks
management (Dauterive) told Ms. Babin that her 26 weeks of short-
term disability leave for the year would expire, and she would be
fired if she did not return to work the following week.  Although
her doctor originally determined that she would be released to work
on March 18, 2005, following that phone call with Saks management,
Ms. Babin visited her physician and sought a release; her doctor
released her to return on February 9, 2005 (the day after Mardi
Gras), without restrictions.

     On February 6, 2005, after her treating doctor released her to
return to work, Ms. Babin fell and broke her left wrist.  Ms. Babin
went to the emergency room in Baton Rouge that day, and then went
to see an orthopedic specialist, Dr. George, on February 7, 2005.
Surgery was recommended, and was scheduled for February 15, 2005.
A note from Dr. George's office suggested that she was restricted
from using her left hand, but he also gave her a doctor's note for
the purpose of enabling her to go back to work.  Ms. Babin states

_____

     [20] The EEOC disputes this and contends that there is no
evidence that Dauterive determined or believed that Ms. Babin had
taken 25 weeks of leave.  The EEOC points out that the evidence on
which Dauterive relied (a report generated by Gina Gagliano) showed
that Ms. Babin had taken only 18 weeks of leave as of January 25,
2005.  The EEOC insists that the record shows that Babin missed no
more than 99 days, and that she received short-term disability
benefits for only 90 days, which is 40 days short of exhausting 26
weeks (130 days) within the relevant leave period.  The EEOC
further asserts that, at the time she was fired, she had only
received short term disability benefits for 13 days from her
current leave balances.

that she was able to use the fingers on her left hand without experiencing additional pain.  She did not contact anyone at Saks to inform them that she had broken her wrist.

*Termination*

Ms. Babin reported to work on February 9, 2005; she was wearing a brace (but no cast or sling).  Ms. Babin performed her job duties on February 9, 10,[21] 11, 12, 13, and 14.[22]  At some point after Ms. Babin returned to work, Cooney told Scurlock and Dauterive that Babin was having difficulty.  Scurlock and Dauterive spoke with Phelan, who decided to terminate Babin because she had exhausted all of her available leave and because Saks was unable to accommodate her working as a makeup artist with a broken wrist.[23]

----

[21] On February 10, 2005 Saks' regional operations official, Pam Thomas, sent an email to Margaret Phelan, copying Marie Joyce, stating that the Estee Lauder people were "outraged" that Ms. Babin had returned to work from her extended medical leaves of absence with a broken wrist.  Thomas stated that the Estee Lauder people wanted to eliminate the position and she stated "we agree."

[22] Saks does not dispute that Ms. Babin worked for several days with her wrist injury.  However, Saks suggests that her wrist injury impacted her work performance.  The EEOC disputes that assertion, pointing to Cooney's testimony that, in observing a couple of makeovers performed by Babin, Babin suffered pain and took a bit longer to complete the makeover.  The EEOC disputes this; Ms. Babin did not tell Cooney that she was in pain and she says she did not take longer to do makeovers.

[23] The EEOC and Ms. Babin dispute that Babin exhausted any of her forms of leave as of February 9, 2005.  In fact, the EEOC points out that, according to Saks' own records, Ms. Babin had only been absent for 19.8 weeks as of February 17, 2005.  Also according to Saks' own records, as of the date of her termination, she had leave balances of 36.25 hours of full sick leave, 783 hours of

On February 15, one of Ms. Babin's weekend days off, she had surgery on her wrist; she was also off on February 16. She reported back to work on February 17, wearing a beige brace in place of the black one she had before the surgery; she was told to report to Dauterive's office. Dauterive told Ms. Babin that she was fired; in a memo to Ms. Babin, Dauterive states:

> This is to notify you that as discussed previously, you have exhausted all available leave time with Saks Fifth Avenue. It also serves to inform you that we cannot accommodate your working as a Make-Up Artist with a broken arm. At this time, Saks Fifth Avenue will be terminating employment, effective immediately.

Ms. Babin asked Dauterive if she could take any other forms of leave, paid or unpaid; he responded that she could not but stated that she could reapply for her position when her cast was removed.[24] At the time of her discharge, Ms. Babin had been aware that Saks had had an open makeup artist position at the La Mer counter since fall 2004. On March 7, 2005, Ms. Babin's cast was removed. She went to Saks on March 8, 2005 to apply for the La Mer position. (According to Ms. Babin, her former position at the Estee Lauder

_____

partial sick leave, 108.75 hours of unused vacation time, and 14.5 hours of personal time.

       Also the EEOC and Ms. Babin dispute that she needed an accommodation of her wrist injury to do her job.

[24] The parties dispute the extent of Saks' awareness of Ms. Babin's disability. Ms. Phelan denies knowledge (at the time she decided to terminate Babin) of her specific condition. However, the EEOC asserts that the record shows that Dauterive and others who influenced the termination decision had knowledge of Ms. Babin's specific condition at the time she was fired.

counter was not posted as open at that time.)  About six weeks later, on April 28, 2005, Ms. Babin was interviewed for the La Mer position.  That same day, Ms. Bolling sent her a letter advising her that Saks did not have any openings that matched Babin's experience.[25]

Saks filled Babin's former position as makeup artist with Estee Lauder, sometime after Ms. Babin's cast was removed, either on March 20 or on May 22, 2005, with Leslie Hubbs, who was not disabled.[26]

Ms. Babin filed a charge of discrimination with the EEOC, asserting violations of Title I of the Americans with Disabilities Act by Saks.  On September 24, 2008 following an investigation, the EEOC sued Saks[27] pursuant to Title I of the ADA and Title I of the Civil Rights Act of 1991, asserting that Marlene Babin was wrongfully terminated because of her ulcerative colitis condition.

---

[25] The parties dispute whether the EEOC has properly raised and preserved a claim for failure to rehire, and further dispute whether evidence of Ms. Babin's application for and denial of a position with La Mer can be introduced at trial.  The Court may consider those issues when the parties present proper papers devoted to those issues.

[26] Saks suggests that it placed Ms. Hubbs into Ms. Babin's position as makeup artist for Estee Lauder on March 20, 2005, but this is disputed by the EEOC because the document on which Saks relies does not reflect a change in Ms. Hubbs' job title.

[27] The EEOC initially misidentified the title of the defendant corporation, but corrected its error in an amended complaint, correctly naming SFAILA, LLC.  SFAILA is referred to as Saks throughout this Order & Reasons.

The EEOC seeks injunctive relief, equitable relief, as well as punitive and other damages for Ms. Babin.  Ms. Babin has intervened in the action, seeking injunctive relief, compensatory damages to recover her economic losses, loss of income, benefits, humiliation, embarrassment, mental and emotional pain and suffering, inconvenience, and loss of enjoyment of life, punitive damages and attorney's fees.

The EEOC now moves for partial summary judgment that Ms. Babin's ulcerative colitis is a disability that substantially limited one or more major life activities.  Saks seeks summary judgment dismissing the EEOC's claim.

I. <u>Summary Judgment</u>

A.
Rule 56 Standard

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio.</u>, 475 U.S. 574, 586 (1986).  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a

factual dispute does not defeat an otherwise properly supported motion. <u>See</u> <u>id</u>. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. <u>Id</u>. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. <u>See</u> <u>Donaghey v. Ocean Drilling & Exploration Co.</u>, 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. <u>Id</u>. Hearsay evidence and unsworn documents do not qualify as competent opposing evidence. <u>Martin v. John W. Stone Oil Distrib., Inc.</u>, 819 F.2d 547, 549 (5th Cir. 1987). Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. <u>Anderson</u>, 477 U.S. at 255.

B.
Competent Summary Judgment Evidence

The defendant urges the Court to disregard Ms. Babin's declaration, which was submitted by the EEOC in support of its motion for partial summary judgment. Saks insists that Ms. Babin "directly contradicts" her prior sworn testimony, and invokes <u>Copeland v. Wasserstein, Perella & Co.</u>, 278 F.3d 472 (5th Cir. 2002) in support of its assertion that the Court should disregard Ms.

14

Babin's declaration. In <u>Copeland</u>, the Fifth Circuit observed that an explanation is required when the sole evidence to create a genuine issue of material fact is an affidavit that conflicts with deposition testimony. <u>Id.</u> at 482. The EEOC counters that Ms. Babin's declaration is consistent with her deposition testimony, and points out that courts routinely deny motions to strike that are based on alleged inconsistencies between deposition and affidavit testimony because such alleged inconsistencies go to the weight of the evidence rather than its admissibility. <u>See</u>, <u>e.g.</u>, <u>Robison v. Cardiology Assocs., L.L.C.</u>, No. 05-1581, 2008 WL 294490, at *1-2 (W.D. La. Feb. 1, 2008). While Ms. Babin's declaration goes into considerable more detail than her purportedly seven hour deposition, the Court is not persuaded that, in her declaration, Ms. Babin "directly contradicts" statements made during her deposition. Moreover, the Fifth Circuit has observed:

> In reviewing a motion for summary judgment the court must consider all of the evidence before it, including affidavits that conflict with deposition testimony. A genuine issue of material fact may be raised by such affidavit "even if it conflicts with earlier testimony in the party's deposition." <u>Kenneth-Murray Corp. v. Bone</u>, 622 F.2d 887, 893 (5th Cir. 1980)(citing 6 Moore's Federal Practice ¶ 56-15[4] at 56-522 (2d Ed.)).... To the extent they exist, discrepancies in those averments present credibility issues properly put before the trier-of-fact. [<u>Id.</u> at 894.] Credibility assessments are not fit grist for the summary judgment mill.

<u>Dibidale of Louisiana, Inc. v. American Bank & Trust Co., New Orleans</u>, 916 F.2d 300, 307 (5th Cir. 1990). The Court will not disregard Ms. Babin's declaration on summary judgment.

Saks also urges the Court to disregard the declaration of Dr. Beck, who is Ms. Babin's current treating physician, on the ground that Dr. Beck makes numerous statements that exceed the scope of his treatment and that were formulated for the purpose of trial. As a treating physician and not a retained expert, Dr. Beck may testify only about the actual treatment rendered to Ms. Babin and opinions derived from the treatment of her ulcerative colitis. Accordingly, to the extent that certain statements made by Dr. Beck do exceed the scope of his treatment (and therefore constitute expert opinions) or are not otherwise made on personal knowledge, the Court will disregard those statements. See Knorr v. Dillard's Store Services, Inc., No. 04-3208, 2005 WL 2060905, at *3 (E.D. La. Aug. 22, 2005)(Vance, J.)(denying defendant's motion to strike plaintiff's treating physicians, but limiting treating physicians' testimony to scope of actual treatment rendered to plaintiff and opinions derived therefrom).

## II.

The Americans with Disabilities Act, 42 U.S.C. § 12102 et seq., prohibits an employer from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions and

privileges of employment." 42 U.S.C. § 12112(a).[28] Under the ADA, "a qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

A.   Prima Facie Case of Discriminatory Discharge

When no direct evidence of discrimination is offered,[29] the Court applies the *McDonnell Douglas* burden-shifting framework[30] to assess ADA violations. EEOC v. Chevron Phillips Chemical Co., LP, 570 F.3d 606, 615 (5th Cir. 2009)(citation omitted). Under that framework, the plaintiff must first make a prima facie showing of an ADA violation by establishing that: (1) she has a "disability"; (2) she is "qualified" for her job; and (3) she suffered an adverse employment action on account of her disability; and (4) she was

---

[28] The recently-enacted ADA Amendments Act, which was passed in late 2008 and made effective on January 1, 2009, was enacted to overrule certain Supreme Court rulings as well as to broaden the Act's coverage; however, because Congress did not express its intent that the changes apply retroactively, they do not apply to this case, in which the allegedly unlawful employment action occurred in 2005. See EEOC v. Argo Distrib. LLC, 555 F.3d 462, 473 n.8 (5th Cir. 2009)(ADA "changes do not apply retroactively").

[29] Ms. Babin and the EEOC allude to "direct evidence" of discrimination but have failed to persuade the Court to analyze the claims as if direct evidence has been presented. The EEOC and Ms. Babin have not identified evidence that, if believed, would establish without inference that the employer's action was based on discriminatory intent.

[30] McDonnell Douglas v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

replaced by or treated less favorably than non-disabled employees. Id. (citation omitted). Once the plaintiff makes a prima facie case, a presumption of discrimination arises, and the burden shifts to the employer to rebut this presumption by articulating a legitimate, non-discriminatory reason for the termination. If the employer meets this burden of production, the plaintiff must then offer evidence sufficient to create a genuine issue of material fact as to whether the defendant's articulated reason is either (1) a mere pretext for discrimination or (2) one reason for the decision, but discrimination was nevertheless the motivating factor for the decision.[31] See Rachid v. Jack in the Box, Inc., 376 F.3d 305, 309 (5th Cir. 2004).[32]

1.   Was Ms. Babin "Disabled" Under the ADA?

An employee may be disabled under the ADA in one of three ways. The ADA defines "disability" as:

(A)  a physical or mental impairment that substantially

_____

[31]   The Fifth Circuit has instructed that the "motivating factor" as opposed to the "sole causation" standard is the appropriate causation standard in ADA cases. See Pinkerton v. U.S. Dept. Of Education, 508 F.3d 207, 213 (5th Cir. 2007). Indeed, the framework now applicable that accounts for tweaking the McDonnell Douglas approach is known as the modified McDonnell Douglas approach. See, e.g., Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc., 482 F.3d 408, 411-12 (5th Cir. 2007)(applying modified approach to Title VII race discrimination claim).

[32]   Rachid is a case concerning the Age Discrimination in Employment Act, but the McDonnell Douglas framework (or the modified framework) is used in all cases alleging discrimination under many different statutes. See EEOC v. Chevron Phillips Chemical Co., LP, 570 F.3d 606, 615 n.6 (5th Cir. 2009).

limits one of more of the major life activities of
such individual;
(B) a record of such impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). The parties do not dispute that Ms. Babin
has ulcerative colitis, but they dispute whether the effect of the
impairment was substantially limiting on her life. Specifically,
the EEOC suggests that her condition substantially limited her in
various major life activities, including waste elimination,
working, caring for herself and interacting with others, eating and
digesting food, and sexual intercourse.

The ADA does not expressly define "substantially limits" but
courts have consulted the EEOC regulations for guidance.[33] A
substantially limiting impairment is determined with reference to
(1) the nature and severity of the impairment, (2) its duration or
expected duration, (3) its permanent or expected permanent long-
term impact. 29 C.F.R. § 1630.2(j)(2). To determine whether an
individual is substantially limited in a major life activity, the
Court must conduct an individualized inquiry, and must consider how

_____

[33] "Substantially limits" means:
(i) Unable to perform a major life activity
that the average person in the general
population can perform; or
(ii) Significantly restricted as to the
condition, manner or duration under which an
individual can perform a particular major life
activity as compared to the condition, manner
or duration under which the average person in
the general population can perform the same
major life activity.
29 C.F.R. §1630.2(j)(1).

19

well an average person in the general population can perform the activity. EEOC v. Chevron Phillips Chemical Co., LP, 570 F.3d 606, 615 n.6 (5th Cir. 2009); EEOC v. E.I. Du Pont de Nemours, 347 F. Supp. 2d 284, 289 (E.D. La. 2004)(Vance, J.)(citation omitted). The Fifth Circuit has observed that "[m]any courts have recognized that relapsing-remitting conditions like...colitis can constitute ADA disabilities depending on the nature of each individual case." Chevron Phillips Chemical, 570 F.3d at 618. The relevant time for assessing the existence of a disability is the time of the adverse employment action. Id.

The EEOC asserts that Ms. Babin was substantially limited in various major life activities, including waste elimination, working, caring for oneself and interaction with others, eating and digestion, and sexual intercourse. Saks insists that Ms. Babin was not substantially limited in any major life activity. Because the record evidence shows an issue of material fact as to the threshold issue, whether Ms. Babin was disabled -- whether Ms. Babin's ulcerative colitis substantially limited her in at least one of these major life activities -- Ms. Babin raises a genuine issue of fact as to whether she is disabled under the ADA.[34] Because the

---

[34] Because the EEOC seeks partial summary relief on the issue of Ms. Babin's disability under the ADA, the Court addresses in turn each of the major life activities in which she is alleged to be substantially limited. And because of the rather obvious issues of material fact that thread throughout these motion papers, the Court takes this timely opportunity to alert counsel to the provisions of 28 U.S.C. § 1927.

record shows that a genuine issue of material fact as to whether Ms. Babin was substantially limited in waste elimination, the Court need not determine at this time whether she raises a triable issue on the other asserted major life activities.

(a) Waste Elimination

Waste elimination has understandably been recognized as a major life activity. Heiko v. Colombo Savings Bank, F.S.B., 434 F.3d 249, 255 (4th Cir. 2006). Indeed, Saks assumes for the purposes of the cross-motions that the elimination of waste is indeed a major life activity under the ADA, but asserts that there is no disputed issue of material fact suggesting that Ms. Babin's ulcerative colitis substantially limited her ability to eliminate waste. The Court disagrees.

While the evidence in the record does not rise to the level of establishing, as a matter of law, that Ms. Babin's ulcerative colitis substantially limited her ability to eliminate waste (as the EEOC insists), a genuine issue of material fact exists, considering all of the medical and other sworn evidence submitted, and renders summary relief inappropriate. It is undisputed that Ms. Babin was diagnosed with ulcerative colitis in 1999 and that ulcerative colitis, to oversimplify, is a chronic disease that affects the large intestine and digestive system and causes abdominal cramping, increased frequency of bowel movements, diarrhea, abdominal pain, and rectal bleeding.

Saks argues that Babin's testimony that her range of bowel movements fluctuated between 10 to 18 per day falls short of showing that her condition substantially limited her ability to eliminate waste. Saks then focuses on how Ms. Babin worked without difficulties (and was able to perform all of her job duties without accommodation) for more than three years at Saks with her condition and the only times she missed work was in connection with her various surgeries. Saks' focus on Ms. Babin's ability to do her job is misplaced. As the Fifth Circuit has observed:

> Considering plaintiffs' abilities to perform their jobs as evidence weighing against finding that they are disabled under the ADA would create an impossible catch-22 for plaintiffs: if their disabilities prevented them from doing their jobs altogether they would not be qualified individuals for the job under the ADA, and if they were able to work through their disabilities they would then not be considered disabled.

EEOC v. Chevron Phillips Chemical Co., LP, 570 F.3d 606, 619 (5th Cir. 2009). Saks does not dispute that ulcerative colitis is a chronic disease of indefinite duration for which there is no known cure. Ms. Babin's ability to do her job while experiencing her symptoms does not preclude a determination that she was disabled under the ADA. See id. Saks seems to ignore the Fifth Circuit's wisdom in Chevron Phillips.

Saks' view of the summary judgment record is limited to the point of distortion: Ms. Babin testified that she used the bathroom approximately 10 to 18 times a day. Her former treating physician, Dr. Tannebaum, testified that Ms. Babin suffered from a

"persistent" and "recalcitrant" case of colitis, in which her symptoms included increased frequency and urgency in eliminating waste, including at times "persistent...bleeding, cramping, and diarrhea." The statements made by Ms. Babin in her declaration simply corroborate in detail the other evidence before the Court;[35] for example, Ms. Babin asserts that she has not produced formed stool since 1999, that she must plan all of her activities around when she can eat because of the frequency and urgency with which she experiences diarrhea; she experiences severe rectal pain during and after excretion and has many times had to soak in baths to relieve the pain she experiences when she goes to the bathroom.

---

[35] Ms. Babin testified in her deposition that the symptoms of colitis she has suffered from since her diagnosis in 1999 include rectal bleeding, abdominal discomfort and cramping, an urgent need to go to the bathroom, and bloody diarrhea. (The bleeding stopped occurring following the March 2004 surgery.) She stated that she uses the bathroom 10 to 18 times daily, depending on if she eats. She times her meals or abstains from eating altogether on certain days. When she eats or when she is stressed, she suffers from abdominal pain that varies in severity. She testified that the pain is

> in the intestines in the J-pouch....food will get trapped in...that loop.... And the rectum, using both medicines are to control the chronic pain and diarrhea.... And a lot of times, I have to sit in a tub of hot water to soothe the rectum area because it feels like it gets so swollen.

In response to a question of whether she ever had a period of remission with the symptoms, she stated "I don't think there is any time that it was ever just any symptoms that was not there, other than the bleeding part. The [times that I use the bathroom] now...depend[] on if I'm going through a lot of stress or the type of food that I eat or something like that can trigger that. And that's a daily thing."

The record evidence, compared to an average person's experience, at the very least, establishes a genuine issue of material fact regarding whether Ms. Babin's ulcerative colitis substantially limits her ability to eliminate waste.

2.   Was Ms. Babin Otherwise "Qualified"?

Even having shown a jury question on whether Ms. Babin was "disabled", a prima facie showing must also be made that the employee was a "qualified individual with a disability."   A "qualified individual" is an employee who can perform the "essential functions" of her job "with or without reasonable accommodation."   42 U.S.C. § 12111(8).   Saks does not address this element of the EEOC's prima facie case and, therefore, the Court assumes that there is no dispute that Ms. Babin was otherwise qualified to perform the essential functions of her duties as makeup artist.[36]

3.   Was Babin fired because of her disability?

The ADA prohibits the discharge of an employee because of disability.   42 U.S.C. § 12112(a).   The EEOC and Ms. Babin assert that she was terminated because of her ulcerative colitis.   The record shows that Ms. Babin took a significant amount of short term

---

[36] Saks asserts that "Babin's colitis never prevented her from being fully able to perform her job as the Estee Lauder makeup artist."   However, to the extent Saks' papers can be read to suggest that Ms. Babin was not qualified to perform her job duties, at the time of her termination (because of her left wrist injury), the Court finds that a genuine issue of material fact is presented.

disability leave time because of her ulcerative colitis. Indeed, it is undisputed that Saks reached out to Ms. Babin while she was on leave and told her that she was required to return by a certain date or risk termination; Ms. Babin returned by that date but was nonetheless fired shortly thereafter. On February 17, 2005 a memo with subject line TERMINATION OF EMPLOYMENT from Larry Dauterive (Assistant General Manager, Operations) to Ms. Babin stated:

> This is to notify you that as discussed previously, you have exhausted all available leave time with Saks Fifth Avenue. It also serves to inform you that we cannot accommodate your working as a Make-Up Artist with a broken arm. At this time, Saks Fifth Avenue will be terminating your employment, effective immediately.

Saks asserts that the EEOC cannot provide evidence of discriminatory motive but then simply assumes that it can be done for the purpose of its motion and moves on to consider the next phase of the McDonnell Douglas burden-shifting framework. The EEOC counters that (1) Saks' reasons for firing Ms. Babin are false[37] and have shifted throughout the course of its investigation and this litigation[38] and (2) similarly situated makeup artists or other

---

[37] To the extent Saks asserted that Babin had exhausted "all available leave time", the EEOC points to record evidence showing that assertion to be false: The EEOC points out that Babin had 14.25 hours of annual leave left when she was fired. Also, after her termination, Saks paid Babin for 108.75 hours of vacation time because it understood itself to be obligated to by law. It is inconsistent to argue, says the EEOC, that Babin was not allowed to take the 108.75 hours of vacation time she had on the books, but it was nevertheless required to pay Babin for that vacation time.

[38] The EEOC points to the following "shifting false reasons" for firing Ms. Babin: Saks told Babin in February 2005

employees that performed makeovers while they had broken arms or wrist problems were not fired. Viewing the record in the light most favorable to Ms. Babin and the EEOC, the Court finds that a juror could reasonably infer that Ms. Babin was fired for reasons relating to her disability.

4.  Was Ms. Babin replaced by a non-disabled employee?

Again, Saks does not appear to dispute this fact: Ms. Babin was replaced with Leslie Hubbs, a non-disabled person. The EEOC also points out that Saks left Ms. Babin's position open for somewhere between one and three months before replacing her with Ms. Hubbs. Because the EEOC has raised genuine issues of material fact precluding summary judgment on its prima facie case of disability discrimination, or at least Saks does not dispute that

_____

that she was fired because she used 26 weeks of short term disability leave, which was the EEOC contends is false, that Babin had exhausted all forms of available leave, which was false, and because Babin could not perform her job with a broken wrist (which was false). The EEOC says that Saks told it essentially the same reasons in its position statement and request for reconsideration in October 2006 and June 2007. However, four years after Babin was fired, in March 2009, Saks asserted, through counsel for the first time, that Babin was fired because of a 30-day waiting period policy, by virtue of which an employee returning from a leave which extends from one year to the next must allegedly wait 30 days before going back out on leave again. This new reason, which the EEOC also asserts is false, more than four years after termination, is a separate indicator of discrimination. Ms. Phelan never told anyone that the 30-day waiting period policy was her reason for firing Ms. Babin until her deposition in August 2009, after Saks represented that that was her motivation in March 2009. The EEOC insists that Saks is dissembling, given that Ms. Phelan never mentioned it to anyone until after Saks' lawyers articulated this alleged reason for the first time four years after firing Babin (and after telling the EEOC other reasons).

such issues are raised on certain elements, the Court next considers Saks' articulated reasons for firing Ms. Babin.

B.  Legitimate, Non-Discriminatory Reason for Termination

Saks contends that it provided Ms. Babin with 26 weeks of leave due to her colitis dating back to February 18, 2004 and that, prior to the expiration of the 26-week period, management told Ms. Babin that she needed to return by February 9, 2005.  That she did, but she did so with a broken wrist.  Notwithstanding the undisputed evidence that Ms. Babin worked on February 9, 10, 11, 12, 13, and 14 with no complaints, Saks fired her, citing as reasons (1) her exhaustion of 26 weeks of leave; and (2) Saks' inability to accommodate her working as a makeup artist with a broken wrist.

While the EEOC disputes the veracity of these articulated reasons, they at the least on their face seem to be legitimate, non-discriminatory reasons for terminating an employee.  Thus, Saks has met its burden of production, and the burden shifts to the EEOC to prove that the stated reasons for termination were pretextual or were simply one reason for the decision but discrimination was nonetheless a motive.

C.  Pretext for Discrimination

The EEOC insists that the record evidence undermines Saks' asserted reasons for firing Ms. Babin: she did not use 26 weeks of leave and that Ms. Babin was able to perform her job duties with her broken wrist; accordingly, Saks' articulated reasons for firing

her are false and pretextual.[39]  Thus, says the EEOC, a jury has an evidentiary basis to reject Saks' stated reasons and infer discrimination as the true motivating factor for her termination. The Court agrees.  See Gee v. Principi, 289 F.3d 342, 347-78 (5th Cir. 2002)(where plaintiff provides sufficient evidence to cast doubt on an otherwise legitimate explanation for an adverse employment action, a reasonable factfinder could conclude that the seemingly legitimate explanation is false; "[r]esolution of this disputed fact is properly within the province of the trier of fact").  Viewing the vast summary judgment record in the light most favorable to the EEOC and Ms. Babin, and mindful that a jury could

---

[39] Specifically, the EEOC notes that Babin did not in fact use 26 weeks of short term disability leave, and Saks never produced evidence to show that she did.  Instead, the undisputed evidence shows (says the EEOC) that Babin had used less than 20 weeks of leave in the year before she was fired; it is also undisputed that she had over 940 hours of available paid leave as well as up to 12 weeks of unpaid leave remaining, at the time she was fired.  It is also undisputed, the EEOC insists, that Babin did her job for six consecutive days (February 6 to 14, 2005) with no accommodation, with a broken wrist before she was fired.  The EEOC points to record evidence supporting its assertion that, during this time, Ms. Babin performed all the functions of her position, which shows that the reasons Saks gave at the time it fired her were false.

The EEOC further suggests that Saks made the decision to fire Babin before she broke her wrist.  The EEOC points to an email from the regional cosmetics manager, Pam Thomas, to Phelan, that stated that the Estee Lauder people were "outraged" by the fact that Ms. Babin had taken 26 weeks of leave and then returned with a broken wrist.  Thomas told Phelan that Estee Lauder wanted to eliminate the makeup artist position, which would result in Ms. Babin's discharge.  The EEOC insists that this is direct evidence of discrimination.

determine that the employer had mixed motives or hid its discriminatory intent behind seemingly neutral rationales, the Court finds that a juror could reasonably infer that Saks' articulated reasons for firing Ms. Babin were pretextual or were simply one motivation for her termination.

D.  Effect of Declining Treatment on ADA Claim

Saks contends that Babin's decision to discontinue use of steroids precludes her ADA claim.  Viewing the evidence in the light most favorable to the EEOC and Ms. Babin, a reasonable juror could conclude that her discontinuance of steroids did not create her disability; Saks fails to point to evidence in the record that would persuade this Court to conclude, as a matter of law, that Ms. Babin's "refusal" to take steroids created her condition.

E.  Effect of Application for Disability Benefits on ADA Claim

Saks also contends that Ms. Babin's application for, and receipt of, social security disability benefits precludes her ADA claim.  On this record, the Court disagrees.  The Supreme Court has observed that an SSDI claim may coexist with an ADA claim, with sufficient explanation.  <u>See</u> <u>Cleveland v. Policy Mgmt. Sys. Corp.</u>, 526 U.S. 795, 798 (1999)(receipt of social security benefits does not preclude person as a matter of law from being a qualified person with a disability under the ADA; to survive summary judgment, ADA plaintiff must explain why SSDI contention is consistent with her ADA claim).  Ms. Babin testified that she

believed she could work, if she was permitted as an accommodation of employment the ability to take frequent bathroom breaks and if she was permitted to take leave if surgery became necessary.   In viewing the record in the light most favorable to the plaintiff, Saks has not shown that Ms. Babin's social security disabled status is inconsistent with her being capable of working, with accommodation.

In conclusion, given the point-counterpoint of fact-slinging in this extensive and tortuous record, summary relief in this case is wholly unjustifiable.

Accordingly, because genuine issues of material fact preclude summary relief, both the EEOC's motion and the defendant's motion are DENIED.

New Orleans, Louisiana, October 21, 2009.

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE